644 So.2d 211 (1994)
David BAND, a Professional Law Corporation and David Band, Individually
v.
FIRST BANKCARD CENTER and First National Bank of Commerce.
No. 94-CA-0601.
Court of Appeal of Louisiana, Fourth Circuit.
September 29, 1994.
Rehearing Denied November 15, 1994.
*212 Sally A. Shushan, John W. Hite, III, Sessions & Fishman, New Orleans, for defendants/appellants.
Sally Dunlap Fleming, New Orleans, for plaintiffs/appellees.
Before KLEES, CIACCIO and WALTZER, JJ.
WALTZER, Judge.
STATEMENT OF THE CASE
David Band, a Professional Law Corporation (BPLC) and David Band (Band), individually, filed suit on 29 July 1993 against First Bankcard Center (FBC) and First National Bank of Commerce (FNBC), seeking the return of sums paid to defendants upon allegedly unauthorized charges on BPLC's credit card, attorneys' fees under the Truth-in-Lending Act (15 U.S.C. § 1601 et seq.), and consequential damages arising out of defendants' alleged negligence. On 15 September 1993, counsel for BPLC and Band paid for and requested service on defendants through their alleged agent for service of process, Andrew Blanchfield.[1] No responsive pleadings *213 having been filed by either defendant, on 12 November 1993, a preliminary default was entered in favor of BPLC against FNBC and FBC. On 17 November 1993, a preliminary default was entered in favor of Band and BPLC against FNBC and FBC.
On 23 November 1993, judgment was entered:
1] in favor of BPLC and against FBC and FNBC for $18,510.71 in unauthorized charges for which defendants received payment from BPLC;
2] in favor of Band and BPLC ordering "all credit bureaus and other credit reporting services" to delete any derogatory reports in their records concerning any delinquencies of Band or BPLC arising out of Band's handling of his corporate credit card "or any other accounts which are the subject of this litigation", and ordering these entities to correct such derogatory reports; and
3] awarding damages to Band, individually, for consequential damages for defendants' tort negligence in the amount of $15,000, plus attorneys' fees in the amount of $1250 and for all costs of the proceeding. Defendants appealed.

STATEMENT OF FACTS
At the hearing on the confirmation of the default, Band was the sole witness. He testified that he discovered in March, 1993 that his secretary had been using his corporate Visa account, making approximately $5000 a month in unauthorized charges. This amount is not supported by the documentary evidence submitted at the hearing.
Band's testimony concerning the secretary's alleged criminal history was muddled; he testified that she had been convicted earlier in 1990, then testified that she had served seven years in St. Gabriel prison. He produced no criminal records to support this hearsay testimony. Band denied he knew of her purported criminal record when he hired her, and claimed to have checked her references, having determined that she had worked for a prominent local attorney, Frederick Gisevius.
Band testified that she suggested in May of 1992 that he should close the corporate account, which he did. Nonetheless, he continued to pay monthly statements rendered by defendants for the secretary's continued use of the card, in the belief that these charges arose out of a "personal check with them [defendants]." Band testified that from April 1992 through March 1993, the secretary's unauthorized charges totaled $21,913.79 of which he paid $18,510.71.
Band testified that when he discovered the fraud in March, 1993, he confronted the secretary, who promised full restitution. Band testified that he advised defendants of the nature of the fraud that had been effected by the secretary. He testified further that when they called his office the secretary, whom he had not yet fired, told them that Band had given her permission to make the charges. Band presented no foundation for this hearsay testimony. He testified further that the defendants then refused to return the sum he paid on the unauthorized charges or to remove the remaining balance on his corporate account representing unpaid and unauthorized charges.
Band testified that defendants reported his account in "past-due" status to the Credit Bureau, as a result of which he personally was unable to refinance the debt secured by a mortgage on his home and was unable to obtain a MasterCard credit card offered by his insurance company. He obtained a copy of his credit reports, and noted an inscription by FNBC of "excessive credit obligations." The Credit Bureau marked FNBC's inscription "disputed." There was no evidence that the post-May 1992 credit status of the corporate credit card that is the subject of this suit formed the basis for any of the denials of credit to Band and his wife, individually. Likewise, there is no evidence that the Band law corporation requested credit and was denied credit based on the allegedly fraudulent and unauthorized charges on the corporate account. The copies of his personal credit reports were not authenticated.
Band introduced exhibits at the default confirmation in support of his allegation that *214 he had been denied credit.[2] Band did not offer any foundation to authenticate any of these exhibits. Neither was there evidence to support the claim that the corporate credit account's status was the basis for the Bands' negative personal credit history upon which these denials of credit were based. Indeed, the record is devoid of any comment by the trial judge tending to show that the documents were received into evidence.
Band also introduced copies of his letters of 24 June 1993 and 22 July 1993 to Equifax Credit Information Service outlining his version of the fraud perpetrated by his secretary. These letters formed part of the in globo offer made by counsel for petitioners, but the record does not contain any evidence that these documents were received into evidence by the trial judge.
The exhibits submitted by BPLC to prove its claim of fraudulent unauthorized use of its credit card included photocopies that purported to be copies of FBC statements.[3]
*215 Neither this court nor the trial court would be able to determine from these statements if the merchandise represented thereon was for business use or was for the personal benefit of the secretary. In no month did the charges, authorized or not, approach the $5,000 per month testified to by Band. These documents were offered as part of the in globo submission by counsel, but the record does not reflect that the trial court admitted any of the documents as evidence.
The record also contains copies of checks drawn on the account of "David Band, A Professional Law Corporation Office and General Account,"[4] "David Band Personal Account"[5] and "David Band Property Management *216 Account,"[6] which appear to be signed but were not authenticated at the confirmation hearing. These checks were not specifically identified in Band's testimony, and the exhibits are merely photocopies of the face of the checks, without any evidence showing that the checks were ever negotiated. Neither was there any testimony to prove when the notations appearing on the face of the checks were made, or by whom, or as to what the notations might signify. There was no evidence showing what these payments represented or whether they were related to the credit card account that is at issue herein. There is nothing in the record to show that the trial court received these documents as evidence.

APPLICABLE LEGAL PRINCIPLES
The obtaining of a judgment by default under the circumstances of this case is governed by LSA-R.S. C.C.P. arts. 1701, 1702(A), and 1703.
LSA-R.S. C.C.P. art. 1701 provides in pertinent part:
"A. If a defendant in the principal ... demand fails to answer within the time prescribed by law, judgment by default may be entered against him. The judgment may be obtained by oral motion in open court ... which shall be entered in *217 the minutes of the court, but the judgment shall consist merely of an entry in the minutes...."
LSA-R.S. C.C.P. art. 1702(A) provides in pertinent part:
"A judgment of default must be confirmed by proof of the demand sufficient to establish a prima facie case...."
LSA-R.S. C.C.P. art. 1703 provides:
"A judgment by default shall not be different in kind from that demanded in the petition. The amount of damages awarded shall be the amount proven to be properly due as a remedy."
The standard of proof required in the context of a default judgment was recently stated by the Louisiana Supreme Court in Sessions & Fishman v. Liquid Air Corp., 616 So.2d 1254, 1258 (La.1993):
"In order for a plaintiff to obtain a default judgment, `he must establish the elements of a prima facie case with competent evidence, as fully as though each of the allegations in the petition were denied by the defendant.' Thibodeaux v. Burton, 538 So.2d 1001, 1004 (La.1989); Blue Bonnet Creamery, Inc. v. Simon, 243 La. 683, 146 So.2d 162, 166 (1962). `In other words, the plaintiff must present competent evidence that convinces the court that it is probable that he would prevail on a trial on the merits.' Thibodeaux, 538 So.2d at 1004. A Plaintiff seeking to confirm a default must prove both the existence and the validity of his claim. There is a presumption that a default judgment is supported by sufficient evidence, but this presumption does not attach when the record upon which the judgment is rendered indicates otherwise. Ascension Builders, Inc. v. Jumonville, 262 La. 519, 263 So.2d 875, 878 (1972); see also Massey v. Consumer's Ice Co. of Shreveport, 223 La. 731, 66 So.2d 789, 790 (1953)." (Emphasis added.)
Where, as here, the record contains a complete transcript of the confirmation proceedings, the reviewing court may determine whether the evidence upon which the default judgment was based was sufficient and competent. Sudds v. Protective Casualty Insurance Company, 554 So.2d 149 (La.App. 2d Cir.1989); Savic v. Assurance Co. of Amer., 509 So.2d 460 (La.App. 3d Cir.1987).
While the judgment is silent as to the basis on which recovery was granted to both Band and BPLC, and the trial court did not supply reasons for its judgment, the fact that the judgment awarded attorneys' fees indicates that the recovery was, at least in part, awarded pursuant to the provisions of the Truth-in-Lending Act. State law does not provide for recovery of attorneys' fees under the various theories put forth in the petition.
Title 15, § 1602 of the United States Code contains definitions applicable to the issues raised herein:
(o) The term "unauthorized use", as used in section 1643 of this title, means a use of a credit card by a person other than the cardholder who does not have actual, implied, or apparent authority for such use and from which the cardholder receives no benefit.
Title 15, § 1643 provides in pertinent part:
(a)(1) A cardholder shall be liable for the unauthorized use of a credit card only if
... (B) the liability is not in excess of $50;
(b) In any action by a card issuer to enforce liability for the use of a credit card, the burden of proof is upon the card issuer to show that the use was authorized or, if the use was unauthorized, then the burden of proof is upon the card issuer to show that the conditions of liability for the unauthorized use of a credit card, as set forth in subsection (a) of this section, have been met. (Emphasis added)
In Louisiana, a cardholder is responsible for all charges made by an employee to whom he has given the card for a limited business purpose, although the cardholder did not specifically and personally authorize the charges and although the cardholder testified to fraudulent misuse of the card. Cities Service Company v. Pailet, 452 So.2d 319 (La.App. 4th Cir.1984).
In order to come within the protection of 15 U.S.C. 1643, entitling it to the return of all but $50 of the disputed charges paid and the unpaid outstanding disputed charges, BPLC must have shown by a preponderance *218 of the evidence that its employee's use of the card over the period from April 1992 through March 1993 was "unauthorized" within the meaning of the statute and the Pailet case. Petitioners take the position in brief and in argument that the card was stolen by Band's secretary, and that in such a case, the thief cannot have apparent authority to use the credit card. However, the record is silent on the issue of theft, and petitioners have not introduced testimony or documentary evidence showing that the secretary stole the credit card or otherwise used it without apparent authority. Petitioners failed to sustain their burden of proving that the secretary's use of the corporate credit card was unauthorized within the meaning of the statute.
In order to obtain a default judgment based on unauthorized use in this state, petitioner's proof must be sufficient to sustain a prima facie case, and the supporting evidence must be competent and preponderant. We find that BPLC and Band failed to sustain this burden of proof.
Band's testimony does not, of itself, offer proof of the elements of the claim under the Truth-in-Lending Act or under state law for negligence, conversion, unjust enrichment or payment of a thing not due. His testimony concerning the secretary's allegedly criminal background is hearsay and without foundation. Likewise, the photocopies of bankcard statements described hereinabove are incompetent as proof of unauthorized charges. In a substantial number of instances, the charges are either missing entirely or are illegible. Statements were submitted and included in the trial court's award for the balance of $3245.98 that existed prior to December, 1991, and for the months of December 1991, January 1992, February 1992, March 1992 and April 1992. Band testified that it was in May of 1992 that the alleged fraudulent unauthorized use of the account began; however, the account was already delinquent, as is evidenced, for example, by the message printed on the statement for March 1992 that Band missed his payment and the February 1992 minimum payment was then past due. There is no authentic evidence to support Band's claims individually or as a representative of his professional law corporation that any specific amount charged on the corporate account was unauthorized. The testimony and the markings on the statements are at times contradictory. Charges for computer software services, for example, were deemed authorized in the earlier months as office expenses, but are marked unauthorized and fraudulent in later months, without a supporting explanation in either Band's testimony or in the exhibits.
The photocopies of checks drawn on his personal account, corporate account and property management account likewise are not probative. There is no evidence proving any of these checks were, in fact, negotiated. Assuming, for the purpose of argument that the checks were, in fact, negotiated by FNBC and/or First Bankcard Center, there is no proof as to the identity of the account or accounts to which these payments were applied. Various account numbers appear on the checks, and the copies show such significant material alteration that they cannot be deemed to constitute competent proof within the meaning of the Louisiana statutory and jurisprudential requirements for confirmation of a default. Significantly, there is nothing in the record to indicate that any of the documents making up the in globo submission were admitted into evidence by the trial court.
The evidence is clear that Band placed his employee in possession of his corporate card, was not prohibited from reviewing the monthly statements that appear to have been mailed to his office, signed checks he contends were in payment of the credit card statements, instructed the employee to cancel the card in May 1992 but never verified that the card was cancelled and actually continued to write checks he contends were in payment of charges on the card through at least February 1993. Band did not authenticate the documentary evidence submitted at the confirmation hearing, and at no time testified to the exact amount of contested charges paid and outstanding. Band referred the trial court to the in globo exhibit containing unclear and unauthenticated and in some cases partial and/or illegible copies of bankcard statements and checks. Such evidence is incompetent to form the basis for *219 the trial court's default judgment. Band's testimony that his secretary made unauthorized charges of $5000 per month is contradicted and unsupported by the documentary evidence he supplied.
We are mindful that the initial review function of an appellate court is not to decide factual issues de novo, and is limited to a determination of manifest error. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). "When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings." Rosell v. ESCO, supra at 844. Allowing for such great deference, we find manifest error in the trial court's award in this case. As the Louisiana Supreme Court held in the landmark Rosell case:
"Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent to implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination." Rosell v. ESCO, supra at 844-845.
Based upon the record, we find that a reasonable factual basis does not exist for the finding of the trial court and further that the judgment of the trial court is manifestly erroneous under the present standard of appellate review, and reverse. Stobart, supra at 882. This case does not present an issue of credibility of the witness, but rather of sufficiency of the evidence.
Pursuant to the Louisiana Supreme Court's directive in Gonzales v. Xerox, 320 So.2d 163, 165 (La.1975), we have conducted a de novo review of the evidence, outlined hereinabove. On the basis of that review, we find that the petitioners failed to prove a prima facie case under the Truth-in-Lending Act or under Louisiana law.
REVERSED.
NOTES
[1] These services were returned with the notation that Blanchfield was not to be found at the given address, 210 Baronne Street, New Orleans, LA. On 4 October, Band requested service on defendants through Sandra Hayden at the same address, and service was effected on 7 October 1993.
[2] 1] 19 February 1993, application by David and Ilonka Band for a credit card sponsored by the Lawyers Weekly Publications through MBNA American was denied because of "sufficient balances on existing revolving credit lines."

2] 26 April 1993, application by David and Ilonka Band for a VISA card through Whitney National Bank was denied because "credit report includes present or past delinquent payment history; credit report indicates excessive number of bankcard lines of credit, and credit report indicates excessive credit obligations."
3] 17 May 1993, application for credit by David and Ilonka Band from Computer City, Gray, Tennessee was denied because of "history of delinquent credit obligations, excessive number of credit bureau inquiries, and ratio of balance to high credit/limit."
4] 9 June 1993, application by David and Ilonka Band for a Whitney Bank overdraft protection account was denied because "credit report includes present or past delinquent payment history, and credit report indicates excessive credit obligations."
[3] [1] closing date 12/12/91 (two copies of the bill are among the exhibits): This shows charges for Shell, Wal-Mart, an over limit fee, and Compuserve, and one of the two exhibit copies is marked by hand "prob for our own charges." The previous balance was $3245.98, a payment of $500 was received, new purchases totalled $41.16, a finance charge of $42.58 was imposed, leaving a new balance, uncontested by Band, of $2839.72.

[2] closing date 1/13/92: This shows charges for Software Etc., Wal-Mart, Compuserve, Woolworth and Maison Blanche. The Maison Blanche item ($64.31) is marked "prob not ours" and the bill is also marked "prob our payment for our stuff." This statement shows payment of $100, a finance charge of $45.24 and a new balance of $2961.58.
[3] closing date 2/12/92 (two copies of the bill are among the exhibits): one copy of the bill is marked "prob ours" and "prob our payment." It shows charges for Prodigy, Compuserve and Alterman Audio, a payment of $100 received, a finance charge of $43.07 and a new balance of $3104.90.
[4] closing date 3/12/92 (three copies of this bill are among the exhibits): on one copy is handwritten "at this point, she said she had closed acct." Another copy includes the words "not ours" with arrows directed at two charges from Keesler in the amounts of $3.70 and $101.20. This bill shows no payment received during the month, imposes a late fee of $10 and a finance charge of $45.46, shows purchases from Keesler, Prodigy and Compuserve totalling $119.85, and a new balance of $3280.21. Appearing above the list of charges is the printed message: "We missed your payment and last month's minimum payment is now past due. Please forward your check today."
[5] closing date 4/13/92 (two copies of this bill are among the exhibits): on one copy is the handwritten notation "prob ours, rest not ours", apparently acknowledging the $12.95 Prodigy charge. The second copy of the bill bears the handwritten notation "all charges from here on were unauthorized fraudulent!" with an illegible mark. This bill includes charges similar to those previously acknowledged as authorized from Prodigy, Wal-Mart and Shell, as well as charges from Lane Bryant, Dillards, Eckerd Drugs, J.C. Penney and Maison Blanche. The copy is unclear, but the finance charge appears to be $31.46 and the new purchases appear to total $587. The new balance is $2199.64.
[6] closing date 5/12/92 (three copies of the first page of the bill, no copies of the second page and three copies of the third page of the bill are among the exhibits): the copies of page three of this statement are illegible. The first page bears the handwritten notation "none of these are our charges", and "unauthorized!". The statement shows new purchases of $3172.53, a finance charge of $47.26 or possibly $42.26 (the copy is unclear) and the printed message above the listing of charges "Are you aware your balance has exceeded your credit line? Please contact us or forward your check today." The new balance appears to be $3517.43. Since the second page of the bill is missing, neither we nor the trial court are able to examine the charges being disputed by petitioner. The statement includes charges, the amounts of which are unclear, from Wal-Mart, Prodigy and Exxon, as well as drug and clothing stores and Shoney's restaurant.
[7] closing date 6/12/92: This statement is marked by hand "#8126 oflre (sic)," "#1721 Personal (changes)", and "can't find check." A second copy of the statement is marked by hand "unauthorized." It shows charges for Prodigy, Wal-Mart, Chevron and Exxon, and for clothing and drug stores. It shows new purchases of $381.72, a previous balance of $3517.43, payments of $1800, finance charge of $47.51 and a new balance of $2146.66.
[8] closing date 7/13/92: This two-page statement is marked "unauthorized!" It shows a Prodigy charge of $12.95, Exxon charge of $14.63, Wal-Mart charge of $71.04 and other charges totalling $1268.90 for new purchases. A finance charge of $49.79 was imposed, and no payments on the account are shown. Above the list of charges is the printed message "Are you aware your balance has exceeded your credit line? Please contact us or forward your check today."
[9] closing date 8/12/92: This statement is marked "unauthorized" and shows payments on account of $2108.71, finance charge of $47.81, new purchases (including a $12.95 Prodigy charge) of $1030.63 and a new balance of $2435.08.
[10] closing date 9/11/92: The copy of the first page of this statement shows it to be page 1 of 2; however, the second page has not been supplied. This statement contains the same printed message as appeared on earlier statements, "Are you aware your balance has exceeded your credit line? Please contact us or forward your check today." The first page shows charges to Wal-Mart of $92.26, 46.31, 92.62 and a Wal-Mart credit of $26.52, together with a Prodigy charge of $12.95. The statement shows new purchases of $1477.80, payments of $500, credits of $26.52 and a finance charge of $45.60, with a new balance of $3431.96. The handwritten notation "# 1590 Personal" appears in the margin.
[11] closing date 10/13/92: The copy does not show the amount of any charge. It is marked "unauthorized" by hand and shows a previous balance of $3431.96, overlimit amount of $96.59, a finance charge of $48.32, payment on account of $1000 and a new balance of $3196.59. Charges in unknown amounts were made to Prodigy, NETworks and Wal-Mart, as well as to clothing stores and a restaurant.
[12] closing date 11/12/92: This copy is marked "all unauthorized" by hand, and the amounts of individual charges are illegible. Printed above the list of charges is the message "Are you aware your account is past due and over [illegible]." There appear to be charges to only Wal-Mart and Prodigy, and a late fee of undeterminable amount.
[13] closing date 12/11/92: This copy is marked "all unauthorized" by hand and consists of two copies of the first page and one of the second page of a credit card statement. The copies are of very poor quality, but charges in unclear amounts are discernible to Prodigy, Wal-Mart, Home Depot, Radio Shack and department stores. The amounts of payments received and new purchases, finance charges and new balance are illegible.
[14] closing date: 1/12/93: This copy is also marked by hand "all unauthorized." It shows charges to Shell of $13.48, to Chevron of $15.25, to Wal-Mart of an illegible number having five digits and seven other amounts, likewise unclear, having four digits each, and a late fee of $10. The new purchases, including a charge by Prodigy and drug, luggage and department stores, total $1086.98.
[15] closing date: 2/12/93: There appear to be two copies of the same page of this statement. One page is marked by hand "unauthorized!" and both copies are illegible. We find no basis for the trial court to be able to determine from these copies the amount or nature of any charges incurred or payments made showing on this statement.
[4] Petitioners also submitted photocopies of the faces of the following checks drawn on David Band a Professional Law Corporation Office and General Account:

[1] #5126 dated 5/11/92 payable to First Bankcard in the amount of $300, on which is written by hand the number "XXXXXXX-XXX-XXX-XXX."
[2] # 5081 dated 3/10/92 payable to First Bankcard Center in the amount of $200, bearing the typewritten note: "Acct. # XXXXXXX-XXX-XXX-XXX David Band, a Professional Law Corporation."
[3] # 5085 dated 3/19/92 payable to First Bankcard Center in the amount of $1500, bearing the handwritten notation: "Office Acct. XXXXXXX-XXX-XXX-XXX."
[4] # 5103 dated 4/13/92 payable to First National Bankcard Center in the amount of $500, bearing the handwritten notation "XXXXXXX-XXX-XXX-XXX."
[5] Photocopies of the face of the following checks drawn on the account of "David Band, Jr. Personal Account" were submitted:e related to the credit card account that is at issue herein. Likewise, the record is devoid of any declaration by the trial court that the documents were admitted into evidence.

[1] # 1721 dated 6/10/92 payable to First Bankcard Center in the amount of $1,000. Typed in the lower left hand corner is "XXXXXXX-XXX-XXX-XXX," which is crossed out by hand and the numbers "XXXXXXX-XXX-XXX-XXX" are written by hand.
[2] # 1725 dated 7/13/92 payable to First Bankcard Center in the amount of $1108.71. The following numbers are handwritten on the check: "XXXXXXXXX" and "XXX-XXXX-XXX-XXX-XXX."
[3] # 1587 dated 8/11/92 payable to First NBC Bankcard Center in the amount of $1,000. Typed and crossed out by hand is the number "XXXX-XXXX-XXXX-XXXX", and written by hand is the number "XXXXXXX-XXX-XXX-XXX."
[4] # 1590 dated 8/13/92 payable to First NBC in the amount of $500. A typed account number is illegible because crossed out by typewritten X's. Below this is typed the number "XXXXXXX-XXX-XXX-XXX" which is crossed out by hand. Underneath this is the handwritten number "XXXXXXX-XXX-XXX-XXX."
[5] # 0342 dated 9/22/92 payable to FNBC in the amount of $1,000: Typed on the face of the check is: "LOC-Bal 9,059.24 Int. 7.5% XXXXXXX-XXX-XXXXXXX." Written on the face of the check are the words "Line of Credit" and the number "XXXX-XXXX-XXXX-XXXX."
[6] #0355 dated 11/18/92 payable to First NBC in the amount of $1000: Typed on this check are the words "Line of Credit." Handwritten in the upper left hand corner of the check is "140-248-" and below the typewritten words "Line of Credit" is handwritten "XXX-XXXXXXX-XXXX."
[7] #0359 dated 11/23/92 payable to First Bankcard Center in the amount of $3,000: Typed on the face of the check is a number that is illegible because it is overstruck by typewritten X's. Beneath that number is typed the number "4625 5791 4024 8477," which is struck out by hand. The words "line of" were written by hand and struck out by hand. Below this is the handwritten number "XXXXXXX-XXX-XXX-XXX." In the upper left hand corner of the check is handwritten "4625 5791 4024 8477."
[8] # 0370 dated 1/15/93 payable to First NBC in the amount of $1000: Handwritten in the upper left hand corner of the check is "XXXXXXXXXXXX." Typed in the lower left hand corner is "Line of Credit" below which is handwritten "Acct #XXX-XXXXXXX-XXXX" and "XXXXXXXXX." The second set of numbers are crossed out by hand.
[9] #0379 dated 2/12/93 payable to First Bankcard Center in the amount of $1000. Typed in the lower left hand corner is "visa XXXXXXXXX."
[6] Photocopies of the faces only of the following checks drawn on the David Band, Jr. Property Management Account, were introduced into evidence as part of the in globo offer, but, from the record, not admitted into evidence by the trial judge:

[1] # 0644 dated 1/15/93 payable to First NBC in the amount of $2,000. Typed on this check is "Line of Credit." Below it are the handwritten and crossed out by hand numbers XXXXXXXXX. Above the words "Line of Credit" is the handwritten number "Acct #001 XXXXXXX-XXXX."
[2] # 0656 dated 2/19/93 payable to First NBC BankCard Center in the amount of $1000. Typed on the check is "Acct. # XXXXXXXXX". The check was apparently reinserted into a typewriter, the word "Visa" was added before the word "Acct." and the original numbers are typed over with X's. The number "XXXXXXX-XXX-XXX-XXX" follows the crossed-out section. The word "Visa", the X's and the new number are aligned slightly higher than the original account number.
[3] # 0649 dated 2/4/93 payable to First Bankcard Center in the amount of $1,000. Handwritten in the top left corner and bottom left corner is the number "XXXXXXXXX." Typed in the lower left hand corner is "Personal Visa XXXXXXXXXXXXXXXX."